## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

IN RE:                                CASE NO. 1:19-bk-13021

PAUL ROGER VERNIER III,               CHAPTER 7

TIFFANY JO VERNIER,

                    DEBTOR(S)

---

## RIGHT TO FORECLOSE STATEMENT

Debtor(s) executed a promissory note secured by a mortgage or deed of trust. The promissory note is either made payable to Creditor or has been duly indorsed. Creditor, directly or through an agent, has possession of the promissory note. Creditor is the original mortgagee or beneficiary or the assignee of the mortgage or deed of trust.

# Exhibit A



**2014R-2222**

GAIL L ALLEY
SCIOTO COUNTY RECORDER

RECORDED ON
04/21/2014      02:43:23PM

RECORDING FEE:      44.00
DOCUMENT TOTAL:   $44.00
PAGES:             4

VOL 0418 PAGE 615



### GENERAL WARRANTY DEED
#### With Survivorship

James P. Brandenburg and Tammy D. Brandenburg, aka Tamara D. Brandenburg, husband and wife, the Grantors, for Ten Dollars ($10.00) and other valuable consideration paid, grant with general warranty covenants, to Paul Roger Vernier III and Tiffany J. Vernier, Grantees, for their joint lives, remainder in fee simple to the survivor of them, whose tax-mailing address is 850 Brouse's Run Road, West Portsmouth, OH 45663, the following described property:

Situated in the Virginia Military Survey No. 12925 in the Township of Washington, County of Scioto and the State of Ohio and being Parcel "B" of the survey shown hereon and being more particularly bound and described as follows:

Beginning at a point at the centerline of Brouses Run Road, said point being the Northwest corner of Parcel "A";

Thence leaving said Parcel "A" and with said centerline ten calls, North 13 deg. 21' 32" West 22.63 feet to a point, Thence North 22 deg. 22' 44" West 22.36 feet to a point, thence North 20 deg. 59' 05" West 21.48 feet to a point, thence North 23 deg. 08' 45" West 38.43 feet to a point, thence North 14 deg. 15' 50" West 40.59 feet to a point, thence North 02 deg. 17' 12" West 86.57 feet to a point, thence north 07 deg. 50' 36" East 70.14 feet to a point, thence north 07 deg. 56' 48" East 10.36 feet to a point, thence with a curve to the left having a radius of 163.64 feet, an arc, length of 125.02 feet, and a chord bearing of north 13 deg. 56' 22" west 122.00 feet to a point, thence north 35 deg. 19' 38" west 7.81 feet to the southwest corner of Parcel "C";

Thence leaving said centerline of Brouses Run Road and with said Parcel "C" North 27 deg. 24' 23" East passing an iron pin (set) at 18.80 feet, in all, 249.13 feet to an iron pin (set) at the State of Ohio property;

Thence leaving said Parcel "C" and with said State of Ohio, South 21 deg. 22' 46" East 636.80 feet to an iron pin (set) at the Northeast corner of Parcel "A";

Thence leaving said State of Ohio and with said Parcel "A" South 77 deg. 06' 27" West, passing an iron pin (set) at 254.34 feet, in all, 278.36 feet to the point of beginning, containing 2.81 acres, and subject to all legal easements, restriction, and rights of way of record.

VOL 0418 PAGE 616



Warranty Deed
Brandenburg to Vernier
Page Two

### SUBJECT TO THE FOLLOWING COVENANT AND RESTRICTIONS:

1. NO LOT OR PARCEL SHALL BE USED EXCEPT FOR RESIDENTIAL PURPOSES. NO STRUCTURE, OTHER THAN SINGLE FAMILY RESIDENCE, SHALL BE ERECTED, ALTERED, PLACED OR PERMITTED TO REMAIN ON LOT. NO STRUCTURE OF TEMPORARY NATURE, SUCH AS TRAILER, TENT, SHACK, OR ANY OTHER OUT BUILDING(S) SHALL BE USED, AT ANY TIME, AS A RESIDENCE.
2. NO MOBILE HOMES, INCLUDING BUT NOT LIMITED TO, PREFABRICATED STRUCTURES, SHALL BE PLACED UPON ANY PORTION OF THE PREMISES FOR PURPOSES OF HUMAN HABITATION, PARKING, STORAGE, OR FOR ANY OTHER PURPOSES, EITHER PERMANENT OR TEMPORARY.
3. NO BUILDINGS SHALL BE ERECTED OR CONSTRUCTED CLOSER THAN FIFTY (50) FEET TO THE CENTERLINE OF BROUSES RUN AND NO CLOSER THAN SEVENTY FIVE (75) FEET TO THE OTHER PROPERTY LINES.
4. NO DWELLING SHALL BE CONSTRUCTED WITH AN INTERIOR LIVING AREA OF LESS THAN 1500 SQUARE FEET, EXCLUDING GARAGE OR BASEMENT AREA.
5. NO JUNK, TRASH, REFUSE, OR GARBAGE, SHALL BE PERMITTED TO ACCUMULATE, OR REMAIN ON ANY PORTION OF SAID PREMISES, EITHER VACANT OR OTHERWISE, AND NO DISABLED OR WRECKED MOTOR VEHICLES, MATERIALS, OR SUPPLIES, MAY BE STORED OR ACCUMULATED AT ANY TIME.
6. THERE SHALL BE NO COMMERCIAL, INDUSTRIAL, OR BUSINESS USE OF ANY LOT OR SAID PREMISES.
7. THE OWNER OF EACH LOT OR PARCEL SHALL KEEP THE GRASS AND WEEDS CUT SO THAT THE APPEARANCE OF THE GROUNDS IS NOT DETRIMENTAL OR OFFENSIVE TO THE ADJOINING PROPERTY OWNERS.
8. NO ANIMALS, LIVESTOCK, POULTRY, ETC., SHALL BE RAISED, BRED, OR KEPT ON LOT EXCEPT DOGS, CATS, OR SMALL HOUSEHOLD PETS, PROVIDED THAT SUCH DOGS, CATS, OR SMALL HOUSEHOLD PETS ARE NOT RAISED FOR COMMERCIAL PURPOSES OR ALLOWED TO BECOME A NUISANCE TO ADJOINING PROPERTY OWNERS.
9. NO ACTIVITIES WHICH CONSTITUTE A PRIVATE OR PUBLIC NUISANCE OR VIOLATION OF ANY LAW SHALL BE DONE OR PERMITTED TO BE DONE ON ANY OF THESE PARCELS.
10. ALL DRIVEWAYS SHALL BE CONSTRUCTED USING A MINIMUM SIXTEEN INCH DIAMETER CULVERT PLACED IN THE BROUSES' RUN ROAD DITCH FOR PROPER DRAINAGE.

VOL 0 4 1 8 PAGE 6 1 7



Warranty Deed
Brandenburg to Vernier
Page Three

11. ENFORCEMENT OF THESE COVENANT & RESTRICTIONS SHALL BE BY LAW.
12. INVALIDATION OF ANY ONE OF THESE COVENANT OR RESTRICTIONS BY JUDGMENT OR COURT ORDER SHALL, IN NO WAY, AFFECT THE OTHER PROVISIONS LISTED. THESE OTHER PROVISIONS SHALL REMAIN IN FULL FORCE AND EFFECT.
13. THERE REMAINS AN EASEMENT FOR THE INSTALLATION (CONSTRUCTION), MAINTENANCE, AND REPLACEMENT OF THE UTILITIES AND DRAINAGE FACILITIES SERVING THESE LOTS/PARCELS. THIS EASEMENT SHALL BE THIRTY FEET WIDE MEASURING FROM THE CENTERLINE OF BROUSES RUN ROAD.
14. JAMES P. BRANDENBURG RESERVES AN EASEMENT FOR THE UTILITY LINES.
15. THE EXISTING WATER METER AND LINE REMAINS THE PROPERTY OF THE OWNERS OF PARCEL "B".

Abstract: Washington, Volume 1, Page 190

Parcel No.: 27-0962.003

LSOT: Being a part of Deed Volume 953, Page 535, dated January 11, 2001, Office of the Recorder, Scioto County, Ohio.

BT-64646B

SAVE AND EXCEPT easements and restrictions of record, zoning ordinances, real estate taxes and assessments, if any, prorated to the date of this deed.

**RECITAL:** Upon the transfer and recording of this Deed of Conveyance, the Recorder of Scioto County, Ohio, is hereby instructed to cancel and release the Land Installment Contract between the within parties, filed in Official Record 412, Page 684, as fully paid and satisfied.

GRANTORS do hereby covenant and warrant unto said GRANTEES, the Grantees' heirs, assigns, and successors, that at the time of the delivery of this deed, the Grantors were lawfully seized in fee simple of the granted premises, that the premises are free from all encumbrances, that the Grantors have good right to sell and convey the same to the Grantees and the Grantees' heirs, assigns, or successors, and that the Grantors do warrant and do hereby agree to defend the same to the Grantees and the Grantees' heirs, assigns, or successors, forever, against the lawful claims and demands of all persons.

VOL 0 4 1 8 PAGE 6 1 8

Warranty Deed
Brandenburg to Vernier
Page Four

Executed on this 16th day of April 2014.

James P. Brandenburg

Tammy D. Brandenburg

STATE of OHIO
COUNTY of SCIOTO, ss:

    Be it remembered, that on this 16th day of April, 2014, before me, a Notary Public in and for said County and State, personally appeared James P. Brandenburg and Tammy D. Brandenburg, aka Tamara D. Brandenburg, husband and wife, the Grantors, whose identities were known or proven to me, and who did sign the foregoing instrument and acknowledged the same as their voluntary act and deed.

    IN TESTIMONY WHEREOF, I have hereunto set my name and official seal.

Notary Public

My Commission Expires: _____

LEONNA J. KOUNS
Notary Public
State of Ohio
My Commission Expires Feb. 17, 2015

This Instrument Prepared By:

EDWARDS, KLEIN, ANDERSON & SHOPE, Co., L.P.A.
Attorneys at Law
211 Center Street
Ironton, Ohio 45638

This Conveyance has been examined and
the Grantor has complied with section
319.202 of the Revised Code
FEE $ 680.00
EXEMPT

# Exhibit B

## Note

| 04/16/2014 | Portsmouth | Ohio |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

850 BROUSES RUN RD, West Portsmouth, OH 45663
*[Property Address]*

**1. Borrower's Promise to Pay**

In return for a loan that I have received, I promise to pay U.S. $ 165,750.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is U.S. Bank N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. Interest**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    4.950%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. Payments**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  1st day of each month beginning on June 01, 2014        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 01, 2044     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 20005, Owensboro, KY 42304-0005 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 884.72

**4. Borrower's Right to Prepay**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

0-V5N
Form 3200 1/01
VMP6N (1302)
Page 1 of 3

**5. Loan Charges**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. Borrower's Failure to Pay as Required**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000% of my overdue payment of principal and interest.

I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. Giving of Notices**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. Obligations of Persons Under this Note**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D VSN
Form 3200 1/01
VMPSN (1302)
Page 2 of 3

**9. Waivers**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. Uniform Secured Note**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
PAUL ROGER VERNIER III          -Borrower

_____ (Seal)
TIFFANY J VERNIER               -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

*[Sign Original Only]*

Loan origination organization **U.S. Bank National Association**
NMLS ID ▓▓▓▓▓▓
Loan originator **Lisa A Callihan**
NMLS ID ▓▓▓▓▓▓

Pay to the order of

_____
Without Recourse
U.S. Bank National Association

_____
Paula T. Hughes
Vice President

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D-VSN
Form 3200 1/01
VMP5N (1302)
Page 3 of 3

# Exhibit C



```
* 2 0 1 4 R - 2 2 2 3   2 0 *
```

## 2014R-2223

GAIL L ALLEY
SCIOTO COUNTY RECORDER

RECORDED ON
04/21/2014      02:43:24PM

RECORDING FEE:    172.00
DOCUMENT TOTAL:  $172.00
PAGES:               20

VOL 0418 PAGE 619



Return To:      USBM

**U.S. Bank Home Mtg-Final Doc**
**7601 Penn Ave S, Ste A1, Richfield, MN  55423**

---

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **04/16/2014**
together with all Riders to this document.
**(B) "Borrower"** is **PAUL ROGER VERNIER, III and TIFFANY J VERNIER, husband and**
**wife**

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is **U.S. Bank N.A.**

Lender is a **National Association**
organized and existing under the laws of **The United States Of America**
Lender's address is **4801 Frederica Street, Owensboro, KY 42301**

Lender is the mortgagee under this Security Instrument.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 1 of 17

VOL 0418 PAGE 620

**(D) "Note"** means the promissory note signed by Borrower and dated **04/16/2014**
The Note states that Borrower owes Lender **One Hundred Sixty-Five Thousand Seven
Hundred Fifty and 00/100ths**                                                    Dollars
(U.S. **$165,750.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **May 01, 2044**
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider             ☐ Second Home Rider
☐ Balloon Rider          ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider               ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 2 of 17

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the
 County of Scioto :
 [Type of Recording Jurisdiction] [Name of Recording Jurisdiction]
See Exhibit A attached hereto and incorporated herein.

Parcel ID Number: 27-0962.003 which currently has the address of
850 BROUSES RUN RD [Street]
West Portsmouth [City], Ohio 45663 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT D_V6OH
VMP ® Form 3036 1/01
Wolters Kluwer Financial Services VMP6(OH) (1302)
Page 3 of 17

VOL:0418 PAGE622

additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.



OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 4 of 17

VOL 0 4 1 8 PAGE 6 2 3

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 5 of 17

VOL 0 4 1 8 PAGE 6 2 4

specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 6 of 17

VOL 0418 PAGE 625

and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 7 of 17

VOL 0 4 1 8 PAGE 6 2 6

Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 8 of 17

VOL 0418 PAGE 627

which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.



OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 9 of 17

VOL 0418 PAGE 628

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 10 of 17

VOL. 0 4 1 8 PAGE 6 2 9

taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 11 of 17

VOL 0 4 1 8 PAGE 6 3 0

terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 12 of 17

VOL 0418 PAGE 631

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 13 of 17

VOL 0 4 1 8 PAGE 6 3 2

an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of

D_V6OH

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

Form 3036 1/01
VMP6(OH) (1302)
Page 14 of 17

VOL 0 4 1 8 PAGE 6 3 3

Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, Scioto
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 15 of 17

VOL 0418 PAGE 634

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
PAUL ROGER VERNIER III                  -Borrower

_____

_____ (Seal)
TIFFANY J VERNIER                       -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                -Borrower

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP®
Wolters Kluwer Financial Services

D_V6OH
Form 3036 1/01
VMP6(OH) (1302)
Page 16 of 17

VOL 0 4 1 8 PAGE 6 3 5

STATE OF OHIO,                          SCIOTO                        County ss:

This instrument was acknowledged before me this 16th day of April, 2014            , by
PAUL ROGER VERNIER III and TIFFANY J VERNIER, husband and wife.

My Commission Expires:                          _Leonna J Kouns_____
                                                 Notary Public

LEONNA J. KOUNS
Notary Public
State of Ohio
My Commission Expires Feb. 17, 2015

This instrument was prepared by
**Melissa dela Cruz**

Loan origination organization **U.S. Bank National Association**
NMLS ID ███████
Loan originator **Lisa A Callihan**
NMLS ID ███████

VOL.0418 PAGE636

Real Estate Legal Description
Vernier, Paul Roger, III and Tiffany J.

## Exhibit "A"

Situated in the Virginia Military Survey No. 12925 in the Township of Washington, County of Scioto and the State of Ohio and being Parcel "B" of the survey shown hereon and being more particularly bound and described as follows:

Beginning at a point at the centerline of Brouses Run Road, said point being the Northwest corner of Parcel "A";

Thence leaving said Parcel "A" and with said centerline ten calls, North 13 deg. 21' 32" West 22.63 feet to a point, Thence North 22 deg. 22' 44" West 22.36 feet to a point, thence North 20 deg. 59' 05" West 21.48 feet to a point, thence North 23 deg. 08' 45" West 38.43 feet to a point, thence North 14 deg. 15' 50" West 40.59 feet to a point, thence North 02 deg. 17' 12" West 86.57 feet to a point, thence north 07 deg. 50' 36" East 70.14 feet to a point, thence north 07 deg. 56' 48" East 10.36 feet to a point, thence with a curve to the left having a radius of 163.64 feet, an arc, length of 125.02 feet, and a chord bearing of north 13 deg. 56' 22" west 122.00 feet to a point, thence north 35 deg. 19' 38" west 7.81 feet to the southwest corner of Parcel "C";

Thence leaving said centerline of Brouses Run Road and with said Parcel "C" North 27 deg. 24' 23" East passing an iron pin (set) at 18.80 feet, in all, 249.13 feet to an iron pin (set) at the State of Ohio property;

Thence leaving said Parcel "C" and with said State of Ohio, South 21 deg. 22' 46" East 636.80 feet to an iron pin (set) at the Northeast corner of Parcel "A";

Thence leaving said State of Ohio and with said Parcel "A" South 77 deg. 06' 27" West; passing an iron pin (set) at 254.34 feet, in all, 278.36 feet to the point of beginning, containing 2.81 acres, and subject to all legal easements, restriction, and rights of way of record.

## SUBJECT TO THE FOLLOWING COVENANT & RESTRICTIONS:

1.    NO LOT OR PARCEL SHALL BE USED EXCEPT FOR RESIDENTIAL PURPOSES. NO STRUCTURE, OTHER THAN SINGLE FAMILY RESIDENCE, SHALL BE ERECTED, ALTERED, PLACED OR PERMITTED TO REMAIN ON LOT. NO STRUCTURE OF TEMPORARY NATURE, SUCH AS TRAILER, TENT, SHACK, OR ANY OTHER OUT BUILDING(S) SHALL BE USED, AT ANY TIME, AS A RESIDENCE.

VOL 0418 PAGE 637

2.  NO MOBILE HOMES, INCLUDING BUT NOT LIMITED TO, PREFABRICATED STRUCTURES, SHALL BE PLACED UPON ANY PORTION OF THE PREMISES FOR PURPOSES OF HUMAN HABITATION, PARKING, STORAGE, OR FOR ANY OTHER PURPOSES, EITHER PERMANENT OR TEMPORARY.

3.  NO BUILDINGS SHALL BE ERECTED OR CONSTRUCTED CLOSER THAN FIFTY (50) FEET TO THE CENTERLINE OF BROUSES RUN AND NO CLOSER THAN SEVENTY FIVE (75) FEET TO THE OTHER PROPERTY LINES.

4.  NO DWELLING SHALL BE CONSTRUCTED WITH AN INTERIOR LIVING AREA OF LESS THAN 1500 SQUARE FEET, EXCLUDING GARAGE OR BASEMENT AREA.

5.  NO JUNK, TRASH, REFUSE, OR GARBAGE, SHALL BE PERMITTED TO ACCUMULATE, OR REMAIN ON ANY PORTION OF SAID PREMISES, EITHER VACANT OR OTHERWISE, AND NO DISABLED OR WRECKED MOTOR VEHICLES, MATERIALS, OR SUPPLIES, MAY BE STORED OR ACCUMULATED AT ANY TIME.

6.  THERE SHALL BE NO COMMERCIAL, INDUSTRIAL, OR BUSINESS USE OF ANY LOT OR SAID PREMISES.

7.  THE OWNER OF EACH LOT OR PARCEL SHALL KEEP THE GRASS AND WEEDS CUT SO THAT THE APPEARANCE OF THE GROUNDS IS NOT DETRIMENTAL OR OFFENSIVE TO THE ADJOINING PROPERTY OWNERS.

8.  NO ANIMALS, LIVESTOCK, POULTRY, ETC., SHALL BE RAISED, BRED, OR KEPT ON LOT EXCEPT DOGS, CATS, OR SMALL HOUSEHOLD PETS, PROVIDED THAT SUCH DOGS, CATS, OR SMALL HOUSEHOLD PETS ARE NOT RAISED FOR COMMERCIAL PURPOSES OR ALLOWED TO BECOME A NUISANCE TO ADJOINING PROPERTY OWNERS.

9.  NO ACTIVITIES WHICH CONSTITUTE A PRIVATE OR PUBLIC NUISANCE OR VIOLATION OF ANY LAW SHALL BE DONE OR PERMITTED TO BE DONE ON ANY OF THESE PARCELS.

10. ALL DRIVEWAYS SHALL BE CONSTRUCTED USING A MINIMUM SIXTEEN INCH DIAMETER CULVERT PLACED IN THE BROUSES' RUN ROAD DITCH FOR PROPER DRAINAGE.

11. ENFORCEMENT OF THESE CONVENANT & RESTRICTIONS SHALL BE BY LAW.

12. INVALIDATION OF ANY ONE OF THESE COVENANT OR RESTRICTIONS BY JUDGMENT OR COURT ORDER SHALL, IN NO WAY, AFFECT THE OTHER PROVISIONS LISTED. THESE OTHER PROVISIONS SHALL REMAIN IN FULL FORCE AND EFFECT.

13. THERE REMAINS AN EASEMENT FOR THE INSTALLATION (CONSTRUCTION), MAINTENANCE, AND REPLACEMENT OF THE UTILITIES AND DRAINAGE FACILITIES SERVING THESE LOTS/PARCELS. THIS EASEMENT SHALL BE THIRTY FEET WIDE MEASURING FROM THE CENTERLINE OF BROUSES RUN ROAD.

VOL 0418 PAGE 638

14.   JAMES P. BRANDENBURG RESERVES AN EASEMENT FOR THE UTILITY
LINES.
15.   THE EXISTING WATER METER AND LINE REMAINS THE PROPERTY OF THE
OWNERS OF PARCEL "B".

Abstract: Washington, Volume 1, Page 190

Parcel No.: 27-0962.003

LSOT: Deed Volume 953, Page 535, dated January 11, 2001, Office of the Recorder, Scioto
County, Ohio.

# Exhibit D

Investor No. 
Loan No:

## LOAN MODIFICATION AGREEMENT (MORTGAGE)

### (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 4TH day of JUNE, 2018, between PAUL ROGER VERNIER III AND TIFFANY J VERNIER, HUSBAND AND WIFE ("Borrower") whose address is 850 BROUSES RUN RD, WEST PORTSMOUTH, OHIO 45663 and U.S. BANK N.A. ("Lender"), whose address is 4801 FREDERICA ST, OWENSBORO, KY 42301, amends and supplements (1) the Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated APRIL 16, 2014 and recorded on APRIL 21, 2014 in INSTRUMENT NO. 2014R-2223  BOOK 0418  PAGE 619, of the OFFICIAL Records of SCIOTO COUNTY, OHIO, and (2) the Note bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

**850 BROUSES RUN RD, WEST PORTSMOUTH, OHIO 45663**
(Property Address)

the real property described being set forth as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1)  As of JUNE 1, 2018, the amount payable under the Note and the Security Instrument (the "New Principal Balance") is U.S. $175,420.85, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2)  $21,500.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount. The new Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $153,920.85. Interest will be charged on the Interest Bearing Principal Balance at a yearly rate of 3.5000% from JUNE 1, 2018. Borrower promises to make monthly payments of principal and interest



of U.S. $596.28 beginning on the 1ST day of JULY, 2018. Borrower will continue to make monthly payments on the same day of each succeeding month until principal and interest are paid in full. If Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. The new Maturity Date will be JUNE 1, 2058.

3)  I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and Security Instrument by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

4)  If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

5)  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

6)  Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

    (a)    all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note

    (b)    all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

7)  Borrower understands and agrees that:

    (a)    All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

    (b)    All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of

Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c)     Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d)     All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e)     Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(f)     Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

By checking this box, Borrower also consents to being contacted by text messaging ☐.

8)   Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents;   (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items."  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all

Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

9) By this paragraph, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked, and Borrower has been advised of the amount needed to fully fund the Escrow Items.

In Witness Whereof, I have executed this Agreement.

_____          6·8·18
Borrower: PAUL ROGER VERNIER III                    Date

_____          6·8·18
Borrower: TIFFANY J VERNIER                         Date

In Witness Whereof, the Lender has executed this Agreement.

U.S. BANK N.A.

By  Angela J Evans                                    (print name)          4/30/18
    Mortgage Document Officer                         (title)               Date

Date: JUNE 4, 2018
Loan Number: █████████
Lender: U.S. BANK N.A.

Borrower: PAUL ROGER VERNIER III, TIFFANY J VERNIER

Property Address: 850 BROUSES RUN RD, WEST PORTSMOUTH, OHIO 45663

## NOTICE OF NO ORAL AGREEMENTS

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.**

Receipt of Notice. The undersigned hereby admit to having each received and read a copy of this Notice on or before execution of the Loan Agreement. "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, pursuant to which a financial institution loans or delays repayment of or agrees to loan or delay repayment of money, goods or any other thing of value or to otherwise extend credit or make a financial accommodation.

_____    _____    6·8·18
Borrower                                                                                                      Date
PAUL ROGER VERNIER III

_____    _____    6·8·18
Borrower                                                                                                      Date
TIFFANY J VERNIER

Date: JUNE 4, 2018
Loan Number: ███████
Lender: U.S. BANK N.A.

Borrower: PAUL ROGER VERNIER III, TIFFANY J VERNIER

Property Address: 850 BROUSES RUN RD, WEST PORTSMOUTH, OHIO 45663

## ERRORS AND OMISSIONS COMPLIANCE AGREEMENT

In consideration of U.S. BANK N.A.

(the "Lender") agreeing to modify the referenced loan (the "Loan") to the Borrower, the Borrower agrees that if requested by the Lender, the Borrower will correct, or cooperate in the correction of, any clerical errors made in any document or agreement entered into in connection with the modification of the Loan, if deemed necessary or desirable in the reasonable discretion of the Lender, to enable Lender to sell, convey, seek guaranty or market the Loan to any entity, including without limitation, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, the Federal Housing Authority, the Department of Veterans Affairs or any municipal bond authority.

The Borrower agrees to comply with all such requests made by the Lender within 30 days of receipt of written request from the Lender. Borrower agrees to assume all costs that may be incurred by the Lender, including without limitation, actual expenses, legal fees and marketing losses, as a result of the Borrower's failure to comply with all such requests within such 30 day time period , will result in the lender adjusting the modified terms without the borrowers consent.

The Borrower makes this agreement in order to assure that the documents and agreements executed in connection with the modification of the Loan will conform to and be acceptable in the marketplace in the event the Loan is transferred, conveyed, guaranteed or marketed by the Lender.

_____    6·8·18
PAUL ROGER VERNIER III                    Date

_____    6·8·18
TIFFANY J VERNIER                         Date

Exhibit "A"

Situated in the Virginia Military Survey No. 12925 in the Township of Washington, County of Scioto and the State of Ohio and being Parcel "B" of the survey shown hereon and being more particularly bound and described as follows:

Beginning at a point at the centerline of Brouses Run Road, said point being the Northwest corner of Parcel "A";

Thence leaving said Parcel "A" and with said centerline ten calls, North 13 deg. 21' 32" West 22.63 feet to a point, Thence North 22 deg. 22' 44" West 22.36 feet to a point, thence North 20 deg. 59' 05" West 21.48 feet to a point, thence North 23 deg. 08' 45" West 38.43 feet to a point, thence North 14 deg. 15' 50" West 40.59 feet to a point, thence north 07 deg. 17' 12" West 86.57 feet to a point, thence north 07 deg. 50' 36" East 70.14 feet to a point, thence north 07 deg. 56' 48" East 10.36 feet to a point, thence with a curve to the left having a radius of 163.64 feet, an arc, length of 125.02 feet, and a chord bearing of north 13 deg. 56' 22" west 122.00 feet to a point, thence north 35 deg. 19' 38" west 7.81 feet to the southwest corner of Parcel "C";

Thence leaving said centerline of Brouses Run Road and with said Parcel "C" North 27 deg. 24' 23" East passing an iron pin (set) at 18.80 feet, in all, 249.13 feet to an iron pin (set) at the State of Ohio property;

Thence leaving said Parcel "C" and with said State of Ohio, South 21 deg. 22' 46" East 636.80 feet to an iron pin (set) at the Northeast corner of Parcel "A";

Thence leaving said State of Ohio and with said Parcel "A" South 77 deg. 06' 27" West; passing an iron pin (set) at 254.34 feet, in all, 278.36 feet to the point of beginning, containing 2.81 acres, and subject to all legal easements, restriction, and rights of way of record.

SUBJECT TO THE FOLLOWING COVENANT & RESTRICTIONS:

1.   NO LOT OR PARCEL SHALL BE USED EXCEPT FOR RESIDENTIAL PURPOSES. NO STRUCTURE, OTHER THAN SINGLE FAMILY RESIDENCE, SHALL BE ERECTED, ALTERED, PLACED OR PERMITTED TO REMAIN ON LOT. NO STRUCTURE OF TEMPORARY NATURE, SUCH AS TRAILER, TENT, SHACK, OR ANY OTHER OUT BUILDING(S) SHALL BE USED, AT ANY TIME, AS A RESIDENCE.

2. NO MOBILE HOMES, INCLUDING BUT NOT LIMITED TO, PREFABRICATED STRUCTURES, SHALL BE PLACED UPON ANY PORTION OF THE PREMISES FOR PURPOSES OF HUMAN HABITATION, PARKING, STORAGE, OR FOR ANY OTHER PURPOSES, EITHER PERMANENT OR TEMPORARY.

3. NO BUILDINGS SHALL BE ERECTED OR CONSTRUCTED CLOSER THAN FIFTY (50) FEET TO THE CENTERLINE OF BROUSES RUN AND NO CLOSER THAN SEVENTY FIVE (75) FEET TO THE OTHER PROPERTY LINES.

4. NO DWELLING SHALL BE CONSTRUCTED WITH AN INTERIOR LIVING AREA OF LESS THAN 1500 SQUARE FEET, EXCLUDING GARAGE OR BASEMENT AREA.

5. NO JUNK, TRASH, REFUSE, OR GARBAGE, SHALL BE PERMITTED TO ACCUMULATE, OR REMAIN ON ANY PORTION OF SAID PREMISES, EITHER VACANT OR OTHERWISE, AND NO DISABLED OR WRECKED MOTOR VEHICLES, MATERIALS, OR SUPPLIES, MAY BE STORED OR ACCUMULATED AT ANY TIME.

6. THERE SHALL BE NO COMMERCIAL, INDUSTRIAL, OR BUSINESS USE OF ANY LOT OR SAID PREMISES.

7. THE OWNER OF EACH LOT OR PARCEL SHALL KEEP THE GRASS AND WEEDS CUT SO THAT THE APPEARANCE OF THE GROUNDS IS NOT DETRIMENTAL OR OFFENSIVE TO THE ADJOINING PROPERTY OWNERS.

8. NO ANIMALS, LIVESTOCK, POULTRY, ETC., SHALL BE RAISED, BRED, OR KEPT ON LOT EXCEPT DOGS, CATS, OR SMALL HOUSEHOLD PETS, PROVIDED THAT SUCH DOGS, CATS, OR SMALL HOUSEHOLD PETS ARE NOT RAISED FOR COMMERCIAL PURPOSES OR ALLOWED TO BECOME A NUISANCE TO ADJOINING PROPERTY OWNERS.

9. NO ACTIVITIES WHICH CONSTITUTE A PRIVATE OR PUBLIC NUISANCE OR VIOLATION OF ANY LAW SHALL BE DONE OR PERMITTED TO BE DONE ON ANY OF THESE PARCELS.

10. ALL DRIVEWAYS SHALL BE CONSTRUCTED USING A MINIMUM SIXTEEN INCH DIAMETER CULVERT PLACED IN THE BROUSES' RUN ROAD DITCH FOR PROPER DRAINAGE.

11. ENFORCEMENT OF THESE CONVENANT & RESTRICTIONS SHALL BE BY LAW.

12. INVALIDATION OF ANY ONE OF THESE COVENANT OR RESTRICTIONS BY JUDGMENT OR COURT ORDER SHALL, IN NO WAY, AFFECT THE OTHER PROVISIONS LISTED. THESE OTHER PROVISIONS SHALL REMAIN IN FULL FORCE AND EFFECT.

13. THERE REMAINS AN EASEMENT FOR THE INSTALLATION (CONSTRUCTION), MAINTENANCE, AND REPLACEMENT OF THE UTILITIES AND DRAINAGE FACILITIES SERVING THESE LOTS/PARCELS. THIS EASEMENT SHALL BE THIRTY FEET WIDE MEASURING FROM THE CENTERLINE OF BROUSES RUN ROAD.

14.   JAMES P. BRANDENBURG RESERVES AN EASEMENT FOR THE UTILITY
LINES.

15.   THE EXISTING WATER METER AND LINE REMAINS THE PROPERTY OF THE
OWNERS OF PARCEL "B".

Abstract: Washington, Volume 1, Page 190

Parcel No.: 27-0962.003

LSOT: Deed Volume 953, Page 535, dated January 11, 2001, Office of the Recorder, Scioto
County, Ohio.

**LBR Form 4001-1(a)**

EXHIBIT E
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
CINCINNATI DIVISION**

| | |
|---|---|
| IN RE: | Case No. 1:19-bk-13021 |
| Paul Roger Vernier III, | Chapter 7 |
| Tiffany Jo Vernier, | |
| | Judge Jeffery P. Hopkins |
| Debtors. | |

---

**RELIEF FROM STAY / ADEQUATE PROTECTION
EXHIBIT AND WORKSHEET — REAL ESTATE
(For use as required by LBR 4001–1(a)(1))**

---

Real property address which is the subject of this motion:
850 BROUSES RUN RD
WEST PORTSMOUTH, OHIO 45663

**DEBT / VALUE REPRESENTATIONS:**

Total indebtedness of the debtor(s) at the time of filing the motion for relief from stay (not to be relied upon as a payoff quotation)          $174,891.91

Movant's estimated market value of the real property          $180,000.00

Source of the estimated valuation          Debtor's Schedules

**STATEMENT OF ARREARAGE:**

(1) As of petition filing date:          $ 1,845.00

    Amounts paid after the date of filing to be applied to the prepetition default:          $ 0.00

(2) Postpetition:          $ 0.00

(3) Monthly payment amount:          $1,134.80

(4) Date of Last Payment: August 19, 2019

(5) Amount of Last Payment:          $300.00

# of payments due postpetition          0 (Through payment due August 1, 2019)

# of payments received postpetition          0

# of payments in default postpetition          0

Total amount of postpetition payments currently in default          $ 0.00

    + Postpetition late charges          $ 0.00

    + Other charges          $ 0.00

| | |
|---|---|
| Foreclosure title work | $ 0.00 |
| Filing fee | $ 0.00 |
| Skip trace | $ 0.00 |
| Document acquisition costs | $ 0.00 |
| Service Process server | $ 0.00 |
| Escrow Shortage | |

| | | |
|---|---|---|
| Hazard Insurance | $ 0.00 | Dates: <MM/DD/YYYY> to <MM/DD/YYYY> |
| Taxes | $ 0.00 | Dates: <MM/DD/YYYY> to <MM/DD/YYYY> |

| | |
|---|---|
| Appraisal | $ 0.00 |
| BPO charges | $ 0.00 |
| Property Inspection | $ 0.00 |
| Other (specify) | $ 0.00 |

= Total Postpetition Arrearage                                                                $ 0.00

**OTHER LOAN INFORMATION:**

| | |
|---|---|
| Date of the Loan | April 16, 2014 |
| Current Interest Rate | 3.5000% |

Money paid to and held by the mortgagee but not applied to the loan: $424.60; if held in the form of checks, balance of such checks N/A, and identity of holder of the checks  N/A.

This Exhibit and Worksheet was prepared by:

/s/Mia L. Conner
Mia L. Conner, Case Attorney
Ohio Supreme Court Reg. No. 0078162
LERNER, SAMPSON & ROTHFUSS
Attorneys for Movant
P.O. Box 5480
Cincinnati, OH 45201-5480
(513) 241-3100
Fax (513) 241-4094
sohbk@lsrlaw.com

404-OH Southern-V1